IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Jimmy A. Haynes,             )
                                 )
               Plaintiff,    )
                                 )
            vs.               )
                                 )
Waste Connections, Inc., and     )
and Waste Connections of South    )
Carolina, Inc.,                )
                                 )
               Defendants.   )
_____)

Civil Action No. 7:16-1922-HMH-KFM

**REPORT OF MAGISTRATE JUDGE**

        This matter is before the court on the defendants' motion for summary judgment (doc. 59). In his complaint, the plaintiff, who is proceeding *pro se*, alleges claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 against his former employer and its parent entity.

        Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

        On March 15, 2017, the defendants filed a motion for summary judgment (doc. 59). By order of this court filed March 16, 2017, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment procedure and the possible consequences if he failed to respond adequately. On March 27, 2017, the plaintiff filed a motion for extension of time until May 1, 2017, to file his response to the motion for summary judgment (doc. 64). On March 29, 3017, the undersigned granted in part and denied in part (doc. 66) a motion to compel filed by the plaintiff on February 22, 2017. The defendants were directed to produce the required information to the plaintiff on

or before April 10, 2017,[1] and the plaintiff's time period for response to the motion for summary judgment was extended through May 1, 2017 (doc. 66). The plaintiff filed another request for an extension on April 27, 2017 (doc. 77), which the undersigned granted, extending the time for the plaintiff's response until May 31, 2017 (doc. 78). The plaintiff filed a response in opposition to the motion for summary judgment on June 2, 2017 (doc. 89), with additional attachments filed on June 5, 2017 (docs. 92, 95). The plaintiff filed an amended response in opposition to the motion on June 8, 2017 (doc. 99), and the defendants filed a reply on June 9, 2017 (doc. 101).

## FACTS PRESENTED

The plaintiff, who is a black male (doc. 1, compl. ¶ 21), was hired by James Fountain, a white male, at Allied Waste in 2006 (doc. 59-3, Fountain aff. ¶ 7). Allied Waste was acquired by defendant Waste Connections of South Carolina, Inc. ("WCSC") in 2009, and the plaintiff began employment with WCSC on April 19, 2009. Mr. Fountain became the Operations Manager for WCSC where he supervised the plaintiff (*id.* ¶ 8).

Defendant Waste Connections, Inc. ("WCI") is the indirect parent entity of WCSC (collectively "the defendants") (doc. 59-4, Cloninger decl. ¶¶ 4- 5). The plaintiff claims that he was an employee of both of the defendant entities, while the defendants argue that he was an employee only of WCSC (*see* doc. 59-1 at 1-2; doc. 99 at 12). The plaintiff has submitted documentation including an offer of employment by WCI, an Employee Handbook Receipt stating that the plaintiff's employment with WCI was at-will, and payroll forms for WCI (doc. 89-2 at 16, 19, 21-24).

Between his initial hire and later termination, the plaintiff drove a large, multi-ton "front-end loader" trash truck in Duncan, South Carolina, picking up trash from customer locations (doc. 59-3, Fountain decl. ¶ 9). According to Mr. Fountain, because of the danger of driving such vehicles throughout the community, safety is a top priority and focus of WCSC (*id.* ¶ 11). The plaintiff agreed that it is critically important for drivers for

---

[1] Upon request by the defendants, the deadline for providing the information to the plaintiff was later extended until April 12, 2017 (doc. 72).

WCSC to stay focused because a lack of focus could lead to tragedy (doc. 59-2, pl. dep. 39). WCSC also places an emphasis on reliability and timely service (doc. 59-3, Fountain aff. ¶ 6).

Mr. Fountain testified in his affidavit that, on June 22, 2015, the plaintiff, after refueling, drove off and ripped a hose away from a fuel pump that he had left in his truck (*id.* ¶ 14; *see also* doc. 59-5, pl. dep., ex. 3). On August 11, 2015, the plaintiff undershot, by several feet, a turn-off of the highway into the driveway of a Dollar General store, and, in the process of doing so, his truck went off the road, down a slope, and got stuck (doc. 59-2, pl. dep. 42-43; doc. 59-5, pl. dep., ex. 3). On August 11, 2015, Mr. Fountain and District Manager Mark Ceresa issued the plaintiff a written warning for "poor performance" regarding the two incidents (doc. 59-3, Fountain aff. ¶¶ 15-17). In the written warning, the following "expectations for corrections of deficiency" were noted: "Increase focus. Pay attention to your surroundings at all times. Focus, focus, focus." (doc. 59-5, pl. dep., ex. 3). When Mr. Fountain and Mr. Ceresa gave the plaintiff the written warning, they also counseled him about the importance of staying focused while driving. According to Mr. Fountain, the plaintiff was indignant, dismissive, and combative, and he did not seem to appreciate the severity of the incidents (doc. 59-3, Fountain aff. ¶ 17). The plaintiff refused to sign the written warning to acknowledge that he had received it (*id.*; doc. 59-5, pl. dep., ex. 3).

The plaintiff disputes that he was the person who drove away with the fuel nozzle left in the truck, noting that there is "no evidence that [he] was the culprit" and that he did not receive the written warning until two months later (doc. 99 at 13; doc. 89-1, pl. aff. ¶¶ J, K). As to the incident at Dollar General, the plaintiff stated that weather was a factor as it was dark, rainy, and foggy at the time of incident (doc. 99 at 13). The plaintiff further stated that when Mr. Fountain arrived at the scene, he stated that if he had known it was not that bad, he would have used a roll-off truck to pull the plaintiff's truck out of the mud (*id.*; doc. 89-1, pl. aff. ¶ I). He stated that the truck did not rest at the bottom of a slope

in a ditch as claimed by the defendants and notes that the Highway Patrol did not cite him for the incident (doc. 99 at 13; doc. 92-2, photos).

On August 25, 2015, the "DriveCam"[2] system recorded the plaintiff with one hand on the steering wheel of his truck and the other hand touching his cell phone (doc. 59-3, Fountain aff. ¶ 19; doc. 59-2, pl. dep. 53-54). The plaintiff was issued a second written warning and received a one-day suspension for this incident (doc. 59-7, pl. dep., ex. 4; doc. 59-2, pl. dep. 57-58). According to Mr. Fountain, the plaintiff violated the Wireless Communication Device Usage Policy (doc. 59-3, Fountain aff. ¶ 19 & ex. B). Mr. Fountain also felt that the plaintiff's actions indicated a rejection of his counseling regarding the plaintiff's need to focus on safe driving practices (*id.* ¶ 23; *see also* doc. 59-6, Ceresa aff. ¶ 14). The plaintiff testified that he was stopped at a red light and looked at his phone to see the time (doc. 59-2, pl. dep. 56-58). The plaintiff further testified that he was told that "when the truck is stopped you can pretty much use the phone" (*id.*). The plaintiff stated that when he returned from his one-day suspension, a clock had been installed in his assigned work truck (doc. 99 at 15). The plaintiff claims that Mr. Fountain had a mechanic turn the sensitivity up on his DriveCam the day before the incident (doc. 59-2, pl. dep. 60). Mr. Fountain testified in his affidavit that it was not possible for a local manager like him to turn up the sensitivity of the DriveCam, and he did not request or direct anyone else to do so (doc. 59-3, Fountain aff. ¶ 21).

The plaintiff testified in his affidavit that he met with Mr. Fountain on September 25, 2015, to discuss his upcoming annual performance review, and Mr. Fountain told him that "everything looks good" and there was "nothing to worry about" (doc. 89-1, pl. aff. ¶¶ 3E-F).

On October 7, 2015, the plaintiff went in to work around midnight, which was two hours before his normal start time (doc. 59-2, pl. dep. 76). The plaintiff testified that he

_____

[2] The DriveCam system in each of the defendant WCSC's vehicles records and delivers a tape of a driver's conduct when it is triggered by certain events, including hard braking, swerving, or sudden stops (doc. 59-3, Fountain aff. ¶ 20).

went in early because he wanted to get off early so that he could have lunch with his wife and play basketball at the YMCA (*id.* 77). The plaintiff's wife testified in her affidavit that the plaintiff was ill with a stomach virus on October 6 and 7, but he went to work anyway (doc. 89-1 at 8-9, K. Haynes aff. ¶¶ 5, 8). She further testified that she did not have lunch with the plaintiff on October 7, and he did not play basketball due to his illness (*id.* ¶¶ 9-10).

When the plaintiff got to work, he was informed by company mechanics that his regular truck was down for repairs, but the mechanics told him they could have a replacement truck ready in five minutes (doc. 59-2, pl. dep. 70-71, 73). The plaintiff responded, "I'm going home; I'm leaving" (*id.* 73). The plaintiff stated in his affidavit that, at the time, he was sick with a stomach virus that caused diarrhea (doc. 89-1, pl. aff. ¶ 3A). The plaintiff did not tell the mechanics that he was sick (doc. 59-2, pl. dep. 68-69). He testified that at 12:48 a.m. on October 7th, he told F. Rebustillo, another driver, that he was sick and unable to work (doc. 89-1, pl. aff. ¶ 3B; doc. 99 at 16; doc. 89-1 at 14, Sprint phone records).

The plaintiff sent a text to Mr. Fountain at 1:12 a.m., stating, "Good morning, Jim. I came down with a stomach virus and I will not be working today. If u have any question let me know" (doc. 89-2 at 74). The plaintiff states in his response in opposition to the motion for summary judgment that, according to timesheets produced by the defendants,[3] he clocked in at 12:40 a.m. on October 7th and clocked out at 1:10 a.m., and thus he sent Mr. Fountain the email within two minutes of leaving work (doc. 99 at 16-17).

Mr. Fountain did not see the plaintiff's text until about 3:30 a.m. on October 7th (doc. 59-3, Fountain aff. ¶ 24). Mr. Fountain then had to scramble to try and get coverage for the plaintiff's route (*id.*). Roughly a quarter of the customers on the plaintiff's route that day did not get their waste needs serviced (*id.*).

---

[3] The plaintiff cites Exhibits 37 and 40 as support for his statement; Exhibit 40 is a copy of the text he sent Mr. Fountain, but Exhibit 37 is not included in the attachments the plaintiff filed with the court (*see* docs. 89-2, 92).

The plaintiff called Mr. Fountain at 3:00 p.m. on October 7th and told him that he felt "much better" and would be able to return to work the next day (doc. 59-2, pl. dep. 83-84).

Prior to the plaintiff's call, Mr. Fountain spoke with company mechanics about what had happened earlier that morning (doc. 59-3, Fountain aff. ¶ 27). The mechanics stated that the plaintiff seemed frustrated about his preferred truck being down and the delay in waiting on the spare truck repair, and he said "forget this" or "F*** this" and left (*id.*). Mr. Fountain and Mr. Ceresa contacted the Human Resource Manager, John Morgan, for guidance; they told Mr. Morgan about the incident that morning and sent him the plaintiff's recent disciplinary documents (*id.* ¶ 28; doc. 59-6, Ceresa aff. ¶ 17; doc. 59-10, Morgan aff. ¶¶ 3-5 & ex. A). Mr. Morgan then also contacted and spoke with each of the mechanics, who recounted the same story they had previously told Mr. Fountain (doc. 59-10, Morgan aff. ¶ 5 & ex. B). Mr. Fountain, Mr. Ceresa, and Mr. Morgan discussed the incident, along with the plaintiff's recent discipline involving the gas nozzle, driving off the road, and the cell phone, along with the plaintiff's attitude when he had been previously counseled, and they came to the conclusion that the plaintiff's employment should be terminated (doc. 59-3, Fountain aff. ¶ 29; doc. 59-6, Ceresa aff. ¶ 18; doc. 59-10, Morgan aff. ¶ 6). On October 8, 2015, Mr. Fountain and Mr. Ceresa met with the plaintiff and told him that his employment was being terminated for job abandonment (doc. 59-3, Fountain aff. ¶ 30; doc. 59-6, Ceresa aff. ¶ 19).

In support of his race discrimination claim, the plaintiff alleges in his complaint that he "sometimes had a contentious relationship" with Mr. Fountain (doc. 1, compl. ¶ 17). In support of that allegation, the plaintiff testified that Mr. Fountain denied his request to take a day off when the plaintiff's wife miscarried in or around 2009 (doc. 59-2, pl. dep. 92). The plaintiff testified that Mr. Fountain said, "I can't let you off; we ain't got nobody to cover your route if you don't come to work; your route going to be on the ground and you're going to be fired" (*id.*).

The plaintiff further alleges in his complaint that he did not trust Mr. Fountain because he "was notorious for exaggerating incidences and making accusatory remarks toward the plaintiff and often failing to show consistency in the way he disciplined [the plaintiff] in comparison to other white drivers" (doc. 1, compl. ¶ 17). The plaintiff alleges in his complaint that driver Mike Schuur, who is white, had "accidents that caused major damages," but remains employed by the defendants (*id.* ¶ 20). In his deposition, the plaintiff testified that he was not aware of Mr. Schuur having any accident (doc. 59-2, pl. dep. 136). In his affidavit, Mr. Fountain testified that Mr. Schuur was involved in an accident, but it was determined not to be his fault (doc. 59-3, Fountain aff. ¶ 33 & ex. H). In his response in opposition to the motion for summary judgment, the plaintiff also identifies driver Joe Hicks, who is white, as a comparator who had several more incidences in a four-month period than the plaintiff had and did not get fired until he had another accident (doc. 99 at 14; doc. 89-2 at 32-39). The plaintiff also identifies Larry Pyle, James Harvey, Ed Long, Kenneth Wade, and Gerald Petty as drivers who had "multiple accidents" but were not terminated from employment (doc. 99 at 20). The plaintiff further alleges in his complaint that two similarly situated white male employees abandoned their jobs for at least two days and were not terminated from employment (doc. 1, compl. ¶ 20). In his deposition, the plaintiff identified Mr. Schuur as a white male employee who abandoned his job for a day or more but was not terminated (doc. 99 at 6). The plaintiff stated in his affidavit that Mr. Schuur told him that he was not coming back to work because he was holding out for another job (doc. 89-1, pl. aff. ¶ S). The plaintiff stated that "to [his] knowledge, [Mr. Schuur] had not contacted the supervisor or management," and Mr. Schuur told him that he was ignoring calls from Mr. Fountain and Mr. Bergin (*id.* ¶¶ S-T).

When asked in his deposition whether Mr. Fountain ever said anything racially derogatory or offensive, the plaintiff testified that Mr. Fountain said that the plaintiff was not one of his "chosen" or "favorites" and that he said this between 20,000 and 50,000 times (doc. 59-2, pl. dep. 10-11). The plaintiff further testified that when he would ask why he was not one of Mr. Fountain's favorites, Mr. Fountain would reply, "You don't do as I tell

you; they [other drivers] do" (*id.* 13).  The plaintiff testified that Mr. Fountain made no other derogatory or offensive comments (*id.* 10).  The plaintiff also testified that he never heard any other manager say anything derogatory or offensive (*id.* 9-10).

In support of his retaliation claim, the plaintiff alleges that he complained about Mr. Fountain to General Managers Rob Wahl, Eric Bergin, and Mark Ceresa from 2009-2015 (doc. 1, compl. ¶¶ 25-29).  The plaintiff testified in his deposition that his complaints were that he did not like "the way [Jim Fountain was] treating" him, "always targeting me, always coming at me with something, always making me out to be the bad guy, always keeping my route on the ground, always asking me to help when a driver's out and never get help in return, always talking to me in a not so good way and using profanity towards me" (doc. 59-2, pl. dep. 96).  The plaintiff testified that he believes he was terminated because of his race and because Mr. Fountain "targeted" him (*id.* 99-100).  He further testified that he has no proof that he was terminated because of any complaint he ever raised about Mr. Fountain (*id.* 99-101).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### Disparate Treatment

In his first and third causes of action, the plaintiff alleges the defendants discriminated against him because of his race in violation of Title VII and Section 1981 (doc. 1, compl. ¶¶ 47-56, 64-69). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000). The standards for liability under Section 1981 and Title VII are identical. *Bryant v. Aiken Regional Med. Ctrs., Inc.*, 333 F.3d 536, 545, n.3 (4th Cir. 2002). "Absent direct evidence of intentional discrimination,[4] Title VII and Section 1981 claims are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973)." *Shun-Lung Chao v. Intl. Bus. Machines Corp.*, 424 F. App'x 259, 260 (4th Cir. 2011) (citation omitted). To establish a *prima facie* case of disparate treatment, a plaintiff must show: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment or the adverse employment action occurred under circumstances giving rise to an inference of unlawful

---

[4] The plaintiff has not presented any direct evidence of race discrimination or retaliation.

discrimination. *Coleman v. Md. Ct. of App.,* 626 F.3d 187, 190 (4th Cir. 2010). If the plaintiff

can establish a *prima facie* case, the burden then shifts to the defendant to produce a

legitimate, nondiscriminatory reason for its actions against the plaintiff. *Tex. Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981) (this is a burden of production, not

persuasion). If the defendant meets this burden, the plaintiff must show by a

preponderance of the evidence that the proffered reason was a pretext for discrimination.

*See Reeves*, 530 U.S. at 147.

"[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that

the employer's asserted justification is false, may permit the trier of fact to conclude that the

employer unlawfully discriminated." *Id.* at 148. However, "if the record conclusively reveal[s]

some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s]

only a weak issue of fact as to whether the employer's reason was untrue and there was

abundant and uncontroverted independent evidence that no discrimination had occurred,"

summary judgment is appropriate. *Id.* Accordingly, the court must evaluate "the strength

of the plaintiff's *prima facie* case, the probative value of the proof that the employer's

explanation is false, and any other evidence that supports the employer's case and that

properly may be considered on a motion for judgment as a matter of law." *Id.* at 148-49.

"Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case

remains the same, necessitating resolution of the ultimate question of . . . whether the

plaintiff was the victim of intentional discrimination." *Merritt v. Old Dominion Freight*, 601

F.3d 289, 294-95 (4th Cir. 2010) (citations omitted).

In support of the fourth element of a *prima facie* case of disparate treatment

based upon race, the plaintiff argues that "white, male, similarly situated employee[s]" were

treated more favorably than him (doc. 89 at 32-33; doc. 99 at 14, 17, 19-21). A comparator

is not "similarly situated" unless they are "similar in all relevant respects" including having

"dealt with the same supervisor... were subject to the same standards . . . and were

engaged in the same conduct without such differentiating or mitigating circumstances that

would distinguish their conduct or the employer's treatment of them for it." *Durant v. SAFE*

*Fed. Credit Union*, C.a. No. 3:13-626-CMC-PJG, 2015 WL 926013, at *4 (D. S. C. Mar. 4, 2015) (internal quotations and citation omitted).

In his complaint and amended response in opposition to the motion for summary judgment, the plaintiff identifies Mike Schuur, Joe Hicks, Larry Pyle, James Harvey, Ed Long, Kenneth Wade, and Gerald Petty as drivers who had accidents but were not terminated from employment (doc. 1, compl. ¶ 20; doc. 99 at 14, 20; doc. 89-2 at 32-39). However, as noted above, the plaintiff testified in his deposition that he was not aware of Mr. Schuur having any accident (doc. 59-2, pl. dep. 135-36). In his affidavit, Mr. Fountain testified that Mr. Schuur was involved in an accident, but it was determined not to be his fault (doc. 59-3, Fountain aff. ¶ 33 & ex. H). Accordingly, the plaintiff has failed to show that Mr. Schuur is a valid comparator in this regard.

The plaintiff contends that the defendants terminated him because of the number of infractions he had in a four month period and that Mr. Hicks had "more" than that number in 2013 (doc. 99 at 14). The defendants argue, however, that they have never asserted that the plaintiff was terminated because of any given number of infractions within a given time frame, and, therefore, the plaintiff's argument is based upon a false predicate (doc. 101 at 5). The plaintiff cites a DriveCam report showing Mr. Hicks using a cell phone while driving, for which Mr. Hicks received a written warning on February 4, 2013 (doc. 89-2 at 34-35); a February 14, 2013, DriveCam report showing Mr. Hicks was distracted while driving, but no accident occurred (*id.* at 36-37); a May 20, 2013, DriveCam report showing Mr. Hicks was late in responding to a traffic situation, but no accident occurred (*id.* at 38); and a June 25, 2013, DriveCam report showing Mr. Hicks using a cell phone while driving (*id.* at 39). As argued by the defendants, the plaintiff has failed to present evidence that Mr. Hicks' incidents were of the same seriousness as his own involving the gas nozzle, driving off the road and getting stuck, touching the cell phone while driving, and leaving the job site prior to his shift. Further, the document produced by the plaintiff showing Facebook messages between himself and Mr. Hicks (doc. 89-2 at 41) is inadmissible hearsay evidence. Fed. R. Evid. 801; *see Maryland Hwys. Contractors Ass'n Inc.*, 933 F.2d 1246,

1251-52 (4th Cir. 1991) ("Hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Further, the plaintiff has shown no evidence that management knew of the incidents discussed in the Facebook messages. *See Duggan v. Sisters of Charity Providence Hosp.*, 663 F. Supp. 2d 456, 463 (D.S.C. 2009) ("And 'unless [the decisionmakers] knew of the [comparators' misconduct] the events cannot be considered in determining whether [plaintiff and his comparators] are similarly situated.'") (citation omitted). Based upon the foregoing, the plaintiff has failed to show that Mr. Hicks  was similarly situated to him in this regard.

The plaintiff argues that Mr. Long "hit a wall while working on Plaintiff's route during his absence, causing costly damage" and that Mr. Long remains employed by the defendants (doc. 99 at 20). However, the plaintiff has failed to present evidence that Mr. Long was at fault or that he had any other incidents similar to those the plaintiff had prior to his termination from employment. Accordingly, the plaintiff has not shown that Mr. Long was similarly situated to him.

With regard to Mr. Harvey, the plaintiff presented evidence that he had a preventable accident, which resulted in "minor" damage, on October 7, 2014, for which he received a last and final warning and two days off unpaid (doc. 89-1 at 62-65). As to Mr. Pyles, he had three DriveCam reports that showed he was following too close (no accident) and two showing use of a cell phone (no accident), a written warning for urinating in a customer's enclosure, and one accident (*id.* at 48-58). Mr. Pyles was terminated from employment by the defendants within a few days of the accident (*id.* at 58-59). As argued by the defendants, given that Mr. Pyles was terminated from employment, assuming that he engaged in misconduct substantially similar to the plaintiff, he was not treated more favorably than the plaintiff. As to Mr. Wade and Mr. Petty, the plaintiff provided no evidence that either driver had any accident with any damage or economic loss. Based upon the foregoing, the plaintiff has not shown that these employees were similarly situated and received more favorable treatment.

The plaintiff further alleges in his complaint that two similarly situated white male employees abandoned their jobs for at least two days and were not terminated from employment (doc. 1, compl. ¶ 20). In his deposition, the plaintiff identified Mike Schuur as a white male employee who abandoned his job for a day or more but was not terminated (doc. 99 at 6). The plaintiff stated in his affidavit that Mr. Schuur told him that he was not coming back to work because he was holding out for another job (doc. 89-1, pl. aff. ¶ S). The plaintiff stated that "he did not come to work for days," "to [his] knowledge, [Mr. Schuur] had not contacted the supervisor or management," and Mr. Schuur told him that he was ignoring calls from Mr. Fountain and Mr. Berger (*id.* ¶¶ S-T). As argued by the defendants, the plaintiff's assertions that Mr. Schuur did not call or contact management for a day or more and did not come back to work for days are inadmissible because they have not been shown to be based on the plaintiff's personal knowledge nor otherwise established by record evidence. Further, Mr. Schuur's alleged comments to the plaintiff that he was not coming back to work and that he was avoiding calls from Mr. Fountain and Mr. Bergin also cannot be considered, because they are inadmissible hearsay. *See* Fed. R. Evid. 801. Furthermore, the plaintiff has not provided evidence that managers knew Mr. Schuur allegedly had left work early or failed to come in. Without such evidence, Mr. Schuur's alleged comings and goings do not render him similarly situated to the plaintiff. *See Duggan,* 663 F. Supp. 2d at 463. The plaintiff has also submitted an "Employee Punch Report" for Mr. Schuur, which the plaintiff contends shows that Mr. Schuur "left work within at least 35 minutes arriving, on more than four occasions in 2014" (doc. 99 at 14; *see* doc. 89-2 at 42-58). However, the plaintiff has no evidence that when Mr. Schuur allegedly left work early, such actions were not authorized by management. The plaintiff has also failed to provide any evidence that Mr. Schuur's disciplinary record was similar to the plaintiff's disciplinary record. Without evidence that Mr. Schuur's alleged conduct was substantially similar in degree or severity to the plaintiff's, Mr. Schuur is not a legally competent comparator.

With regard to Mr. Hicks, the plaintiff has presented evidence that on April 16, 2013, Mr. Hicks became angry when his supervisor called him about a customer issue, and Mr. Hicks said that he "quit" and brought his truck back to the yard (doc. 89-2 at 33). He then called and asked for his job back, and it was decided that he could withdraw his resignation with the understanding that his behavior would have to improve and he was in a probationary status (*id.*). It was also decided that he would take a swing position and that any other issue could result in his termination from employment (*id.*). As argued by the defendants, the plaintiff's and Mr. Hicks' conduct are not substantially the same. The plaintiff did not quit, but instead left his job without speaking to management prior to leaving.

As for other evidence showing his termination occurred under circumstances giving rise to an inference of unlawful discrimination, the plaintiff admitted that the only derogatory or offensive comments any decisionmaker made towards him throughout his employment was Mr. Fountain stating that the plaintiff was not one of his "chosen" or "favorites" (doc. 59-2, pl. dep. 10-11). The plaintiff further testified that when he would ask why he was not one of Mr. Fountain's favorites, Mr. Fountain would reply, "You don't do as I tell you; they [other drivers] do" (*id.* 13). These comments, even if made between 20,000 and 50,000 during his employment as alleged by the plaintiff, have "no discernable racial connotation[,] and [the] plaintiff does not argue as much." *Stewart v. Morgan State Univ.*, 46 F. Supp. 3d 590, 597 (D. Md. 2014).

Additionally, Mr. Fountain originally hired the plaintiff at Allied Waste in 2006 and then later brought him on board when WCSC acquired Allied in 2009 (doc. 59-3, Fountain aff. ¶¶ 7-8; doc. 59-1, pl. dep. 110-11). Mr. Fountain was also one of the decisionmakers who terminated the plaintiff's employment in October 2015. "[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991). Here, Mr. Fountain hired the plaintiff knowing the plaintiff's race, and some nine years later, he was one of the decisionmakers

who terminated the plaintiff's employment. While the time lapse between the plaintiff's hiring and firing may prevent application of a "strong inference" that discrimination *was not* a determining factor as described in *Proud v. Stone*, it is certainly evidence that weighs against any inference that discrimination was a determining factor in the plaintiff's termination from employment.

Based upon the foregoing, the plaintiff cannot establish the fourth element of a *prima facie* race discrimination claim – that similarly situated employees outside the protected class received more favorable treatment than him or his termination from employment occurred under circumstances giving rise to an inference of unlawful discrimination.[5]

Even if the plaintiff could show a *prima facie* case of disparate treatment based upon race, the defendants have set forth a legitimate, nondiscriminatory reason for his termination: after several performance issues, he walked off the job without prior notice to management.

The plaintiff argues that he can show that the defendants' proffered reason was pretext for race discrimination based upon the defendants' "shifting reasons" for his termination (doc. 99 at 24, 31-34). Courts have held that shifting reasons for adverse action is probative of pretext. *E.E.O.C. v Sears Roebuck & Co.*, 243 F.3d 846, 852-853 (4th Cir. 2001). However, here, the plaintiff has failed to show that the defendants have given shifting or changing reasons for his termination from employment.

The plaintiff contends that, in the meeting with Mr. Fountain and Mr. Ceresa on October 8, 2015, Mr. Fountain told him that he was being fired for "job abandonment" (doc. 99 at 31-32). The plaintiff argues that because the company policy defines job abandonment as "3 days no call, no show," he clearly did not violate this policy, and thus

---

[5] The plaintiff can clearly meet the first and third elements of a *prima facie* case. While the defendants also argue that he cannot establish the second element by showing that he was performing his job satisfactorily (doc. 59-1 at 12-15), consideration of this issue is unnecessary given the undersigned's findings as to the fourth element.

the defendants' stated reason for terminating his employment was false (*id.*; *see* doc. 89-1 at 20-21, policy). However, the plaintiff has presented no evidence that any manager ever told him that his conduct violated the job abandonment *policy*. Rather, as set forth in the plaintiff's transcript of his meeting with Mr. Fountain and Mr. Ceresa, when the plaintiff asked Mr. Fountain what he meant in saying that the plaintiff was being terminated for "job abandonment," Mr. Fountain did not refer to the defendants' job abandonment policy, nor did he refer to the three-day no-call, no-show conduct it prohibited. Rather, according to the plaintiff's transcript, Mr. Fountain told the plaintiff that his job abandonment consisted of his "coming in and leaving" (doc. 99 at 4). Further, the defendants did not check the "job abandonment" entry on the plaintiff's separation notice, but rather checked "violation of rules" as the reason for termination (doc. 89-1 at 16). As argued by the defendants, the prohibited conduct policy prohibits "failing to obtain permission to leave work for any reason during normal working hours" (*id.* at 37). The plaintiff contends that, since he came to work early his last night, he did not leave during "normal working hours," and thus he did not violate the precise terms of this policy (doc. 99 at 7). However, there is absolutely no evidentiary support that management ever viewed this policy as applying only when employees worked their "regularly scheduled" hours, as opposed to hours worked before or after a "regular shift."

The plaintiff contends that the defendants' justification for his termination from employment shifted from job abandonment to "absenteeism" (doc. 99 at 6, 32). The plaintiff notes that he did not have any absenteeism issues near the time of his termination (*id.*). In support of his argument that the defendants shifted their reason from job abandonment to absenteeism, the plaintiff states that he was initially denied unemployment compensation because the defendants gave the South Carolina Department of Employment and Workforce ("SCDEW") documentation to support a claim that he was fired for absenteeism

(*id.* at 32).  The SCDEW's Decision of Appeal Tribunal,[6] which was submitted by the plaintiff as an exhibit to his response in opposition to the motion for summary judgment, states that "[t]he employer discharged him for absenteeism" (doc. 89-1 at 30).  However, the plaintiff has not provided any proof that the defendants themselves made that assertion; the Appeals Council's decision specifically states that the defendants did not appear to provide testimony (*id.* at 31).  As such, the SCDEW's statement regarding the reason for the plaintiff's termination is irrelevant. *See Watson v. Shenandoah Univ.*, C.A. No. 5:14cv22 2016 WL 8619550, at *12 (W.D.Va. Nov. 14, 2016) (because management consistently provided the same reasons for terminating an employee, a grievance committee's unsupported determination regarding the reason for termination was irrelevant and was not probative evidence of pretext).  Here, as noted by the plaintiff, "at no time . . . did Mr. Fountain and Mr. Ceresa mention 'absenteeism' as a cause of the plaintiff's termination" (doc. 99 at 9).  The plaintiff has provided no evidence that the defendants ever stated that he was terminated due to absenteeism.

The plaintiff next argues that the defendants' justification for his termination shifted to "poor performance," which he argues is pretextual because the evidence shows he "was doing his job well enough to meet and/or exceed his employer's legitimate expectations . . . " (doc. 99 at 11).  In support of his argument, the plaintiff cites his satisfactory 2010 performance review, Mr. Fountain's statement in September 2015 that the preliminary review of his annual performance was "looking good," and his receipt of several bonuses around the time of his termination (*id.* at 7, 9, 11; *see* doc. 89-2 at 8-13).  However, a performance review from 2010 neither logically nor legally establishes that the plaintiff's performance five years later in 2015 was also necessarily satisfactory.  Likewise, allegedly being told in September 2015 that "everything looks good" is not inconsistent with being terminated a month later, for actions the plaintiff took after such alleged statements.  Additionally, whatever performance-related comments Mr. Fountain made in September do

---

[6] The Appeal Tribunal reversed the prior determination and found that the plaintiff was eligible for unemployment benefits (doc. 89-1 at 30-31).

17

not erase the written comments he made in August 2015, when he issued the plaintiff a written warning for "poor performance" and a second written warning and one-day suspension for violation of company policy (doc. 59-3, Fountain aff. ¶¶ 15-17, 19 & ex. A; doc. 59-7, pl. dep., ex. 4). Further, in his affidavit, Mr. Fountain stated that the plaintiff was dismissive of the coaching he received following the above incidents (doc. 59-3, Fountain aff. ¶¶ 17-18, 23).

The plaintiff's argument that his receipt of bonus payments is probative of pretext also fails. Mr. Fountain testified in his supplemental affidavit that the plaintiff, like all other front-end load drivers, was eligible for a monthly bonus up to $300 for meeting basic performance expectations, such as attitude, attendance, and customer service (doc. 101-1, Fountain supp. aff. ¶¶ 3-4). The month the check was issued reflected the performance in the prior month (doc. 101 at 11 n.2). While the plaintiff contends that he received the maximum bonus of $300 for September 2015 (doc. 99 at 7), the evidence he submitted shows that his bonus in September was $60.00 (doc. 89-1 at 42), which the defendants contend reflects the write-ups the plaintiff received in August for incidents involving the gas nozzle and running off the customer's driveway (doc. 101 at 11). Likewise, the defendants contend that the plaintiff's October bonus check totaling $180.00, rather than the full $300 bonus target, reflected the cell phone incident (doc. 89-1 at 43).[7]

"The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir.2000). "[W]e do not sit to appraise [the employer's] appraisal. Rather, our sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory." *Hawkins v. Pepsi Co.*, 203 F.3d 274, 279–80 (4th Cir.2000) (internal quotations and citations omitted). Here, the plaintiff has failed to present evidence

---

[7] The plaintiff also received a paycheck in December 2015, reflecting the pay period beginning November 29, 2015, which was after the plaintiff's termination and during a time period in which the plaintiff did not work (doc. 89-1 at 45). Accordingly, per the testimony of Mr. Fountain in his supplemental affidavit, this was the result of a clerical error and should not have been issued as the plaintiff was terminated from employment on October 8, 2015 (doc. 101-1, Fountain supp. aff. ¶ 5).

upon which a reasonable jury could determine that he was treated disparately because of his race.  Accordingly, summary judgment should be granted to the defendants on the plaintiff's disparate treatment claim.

### Retaliation

In his second cause of action, the plaintiff alleges the defendants retaliated against him in violation of Title VII because of his complaints that he was unfairly treated (doc. 1, compl. ¶¶ 57-63).  The elements of a *prima facie* retaliation claim are:  (1) engagement in protected activity; (2)  adverse employment action; and (3)  a causal link between the protected activity and the employment action. *Coleman*, 626 F.3d at 190 (citation omitted).  If the plaintiff makes a *prima facie* showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006).  If the employer makes such a showing, the burden returns to the plaintiff to establish that this reason is a pretext for retaliation. *Id*.

The plaintiff has provided no evidence to show that he ever complained about race discrimination or otherwise engaged in any protected activity for purposes of a retaliation claim. *Jackson v. S.C. State Ports Auth*., C.A. No. 2:12-1283-DCN-BM, 2014 WL 643270, at *3 (D.S.C. March 4, 2014) ("A generalized claim by an employee that they have been subjected to 'unfair treatment' is not protected activity for purposes of a civil rights claim."); *Rouse v. Int'l Paper Co.*, C.A. No. 2:12-1052-DCN, 2014 WL 131150, at *8 (D.S.C. Jan. 14, 2014) (retaliation claim fails where plaintiff presents no evidence that he ever complained to anyone about race discrimination); *Sung Kun Kim v. Panetta*, No. 11-1370, 2012 WL 3600288, at * 17 (E.D. Va. Aug.21, 2012) ("Protected activity does not include generalized employment-related complaints unrelated to Title VII prohibited discrimination.")*; Harris v. Md. House of Corr.*, 209 F. Supp.2d 565, 570 (D. Md. 2002) (recognizing that general complaints about "unfair treatment" are insufficient to support a Title VII retaliation claim).  Here, the only evidence presented by the plaintiff with respect to the first element of a *prima facie* case of retaliation is that he complained to various District Managers about "the way [Mr. Fountain] was treating him" (doc. 59-2, pl. dep. 96;

19

*see also* doc. 89-1, pl. aff. ¶ O ("I repeatedly told each of them I was being treated unfairly in many respects . . . ."). As set forth above, this is insufficient evidence for a reasonable jury to find that he engaged in protected activity.

Furthermore, even if the plaintiff could show that he engaged in protected activity, he has failed to show any evidence establishing a causal connection between his complaints regarding his treatment and his termination from employment. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) (a plaintiff "must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action(s)"). Viewing the evidence in a light most favorable to the plaintiff, there is no evidence to suggest that any of the decisionmakers predicated their termination decision on any such alleged complaint. In his deposition, the plaintiff testified that he has no proof that he was terminated because of any complaint he ever raised about Mr. Fountain's treatment of him (doc. 59-2, pl. dep. 99-101).

Based upon the foregoing, summary judgment should be granted to the defendants on the plaintiff's retaliation cause of action.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment (doc. 59) be granted.[8] Should the district court adopt this recommendation, the pending nondispositive motions (docs. 98, 100) will be rendered moot.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

August 14, 2017
Greenville, South Carolina

---

[8] As the undersigned recommends that summary judgment be granted to the defendants on the merits of the plaintiff's claims, the defendants' argument that the claims against WCI should be dismissed because it was not the plaintiff's employer (doc. 59-1 at 9-10) will not be addressed.

20

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).